[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

————————————

No. 10-14622

————————————

D.C. Docket No. 1:08-cv-00077-CAP

| FILED |
| U.S. COURT OF APPEALS |
| ELEVENTH CIRCUIT |
| FEB 7, 2012 |
| JOHN LEY |
| CLERK |

THOMAS HAYDEN BARNES,

Plaintiff-Appellee,

versus

RONALD M. ZACCARI, individually and in his official
capacity as President of Valdosta State University,
BOARD OF REGENTS OF THE UNIVERSITY
SYSTEM OF GEORGIA,

Defendants-Appellants.

————————————

Appeal from the United States District Court
for the Northern District of Georgia

————————————

(February 7, 2012)

Before DUBINA, Chief Judge, COX, Circuit Judge, and GOLDBERG,* Judge.

COX, Circuit Judge:

———————————

*Honorable Richard W. Goldberg, United States Court of International Trade Judge, sitting
by designation.

In 2007, in the wake of the massacre at Virginia Tech, Ronald Zaccari, the President of Valdosta State University at the time, "administratively withdrew" (expelled) Thomas Hayden Barnes, a student, on the ground that Barnes presented a "clear and present danger" to the campus. Barnes sued Zaccari in federal court, claiming that under the Due Process Clause he was due notice of the charges, and a hearing to answer them, prior to his removal from campus. The district court agreed with Barnes, and denied Zaccari summary judgment based on qualified immunity. We affirm.

In his suit, Barnes joined the Board of Regents of the University System of Georgia as a defendant. His claim against the Board is a state-law breach of contract claim for damages. This claim asserts that the student handbook and contracts for student housing establish binding agreements between the Board and university students, and that the Board breached these agreements by failing to afford him the process due prior to his removal from campus. The Board sought summary judgment grounded on Eleventh Amendment immunity. The district court denied the Board summary judgment, concluding that by statute Georgia has waived its immunity from suit in federal court for breach of contract. The Board appeals. We reverse.

2

## I. FACTS

The district court denied Zaccari's motion for summary judgment based on qualified immunity and the Board's motion for summary judgment based on Eleventh Amendment immunity. On this interlocutory appeal from that order, we view the facts in the light most favorable to the non-moving party. *Jackson v. Sauls*, 206 F.3d 1156, 1164 (11th Cir. 2000) (citation omitted). Thus, we state the facts in the light most favorable to Barnes.

### A. BACKGROUND

In 2005, Barnes enrolled in Valdosta State University ("VSU"), a public institution in the University System of Georgia. He subsequently left VSU to attend a different school, but re-enrolled in January 2007. Barnes suffered from anxiety and agoraphobia at the time. During his first term at VSU, Barnes began meeting with a therapist at the VSU counseling center, Leah McMillan. He resumed sessions with McMillan upon returning to VSU in 2007. During the time period relevant to this appeal, Barnes was on academic probation. But he was making sufficient academic progress to remain a student at VSU.

The Board is an arm of the State of Georgia. Under the Georgia constitution, it has authority to oversee and administer the University System of Georgia. Zaccari was the president of VSU at the time in question. During his tenure, Zaccari had

3

developed a master plan for the campus, which included constructing a new parking deck. In March 2007, the VSU student newspaper ran a story detailing the plan to build the parking deck.

When Barnes learned about the plans for the parking deck, he became concerned about its environmental impact and decided to oppose it. He posted a series of flyers around campus, emailed VSU officials and students about his concerns, and posted information about the project to his Facebook webpage. Zaccari saw one of Barnes's flyers and was displeased. Through a student environmental group, Zaccari identified Barnes as the source of the flyers. Because the student group expressed concerns about Zaccari's displeasure, Barnes wrote Zaccari an apology saying that he did not want his "actions to be perceived as a personal 'attack' or to jeopardize other environmental initiatives on campus." (Dkt. 179-9 at 42.)

But Barnes continued to voice his concerns. He wrote a letter to the editor of the student newspaper expressing his views. In that letter, he criticized the decision to build the parking deck as short-sighted as well as a waste of university real estate and $30 million. Barnes also learned that the Board would meet to consider approval of the parking deck on April 17. He contacted several Board members directly to voice his concerns. Barnes's messages were respectful.

4

When Zaccari learned that Barnes had contacted members of the Board directly, he summoned him to his office on April 16. During that meeting, Zaccari explained the reasons for building the parking deck and expressed frustration with Barnes's continued opposition. (Dkt. 190 at 114–19.) This litigation arises out of the events which unfolded following that meeting.

## B.  BARNES'S ALLEGEDLY THREATENING BEHAVIOR

The particular details of Barnes's behavior are largely undisputed. But the parties dispute the inferences that can be drawn from his behavior. Thus, we characterize this behavior in the light most favorable to Barnes.

On April 16, the same day Barnes met with Zaccari, a student at Virginia Tech shot and killed thirty people. The shooting alarmed Zaccari and other officials in the University System of Georgia. Zaccari says this tragedy put him in a heightened state of alert.

Shortly after their meeting, Barnes sent Zaccari three emails. One explained Barnes's rationale for posting his flyers about the parking deck as well as his political philosophy. Another listed other universities which employ shuttle systems. The third email included a reference to cutting down the last tree on Easter Island. It characterized the inhabitant's decision to cut down that tree as making economic sense under their business plan. These emails show Barnes was passionate about

5

environmental issues.  He also admitted a willingness to resort to confrontation politics.[1]  But the emails contain no overt threats and do not suggest that Barnes wanted to harm anyone.

A few days later, a letter from Barnes appeared in the in-box of one of Zaccari's staff members.  It is unclear how the letter arrived.  Zaccari contends the letter's arrival compromised the security of his office.  (Dkt. 177-2 at 18.)  In the letter, Barnes requested an exemption from the $100 fee earmarked for the parking deck's construction and offered to donate that sum to a campus environmental program.  Like Barnes's emails, the letter is not threatening.  Barnes had no further contact with Zaccari.

Unbeknownst to Barnes, Zaccari was monitoring his Facebook webpage.  A few days before Barnes met with Zaccari, he posted a satirical collage to that webpage.  The collage's title read "S.A.V.E.—Zaccari Memorial Parking Garage" and included a portrait of the president.[2]  Zaccari did not learn about this collage until after his meeting with Barnes.  A few days after their meeting, Barnes posted several

---

[1] Barnes's first email referred approvingly to the mayoral administration of Dennis Kucinich and his willingness to resort to confrontation politics. (Dkt. 177-12.)

[2] The collage also included images of the proposed parking deck, a bulldozer, a globe flattened by a tire tread, an asthma inhaler, and a public bus under a red circle and slash.  It included slogans such as "more smog," "bus system that might have been," and "climate change statement for President Zaccari."  (Dkt. 179-9 at 51.)

more items. These included some unrelated material, a status update saying, "Hayden
Barnes is cleaning out and rearranging his room and thus, his mind, so he hopes," and
a link to an article on salon.com titled "I'm mentally ill but I'm no mass murderer."
(Dkt. 244 at 9–10.) The author of that article offered a reader advice about dealing
with the stigma of mental illness in the wake of the tragedy at Virginia Tech.[3] Zaccari
learned of these items on April 23.

### C. ZACCARI'S RESPONSE TO BARNES'S BEHAVIOR

Immediately after their April 16 meeting, Zaccari began looking for a way to
remove Barnes from campus. He reviewed Barnes's academic work as a possible
basis for removing him from campus. Zaccari's efforts intensified on April 20. The
day before, Barnes's letter to the editor had appeared in the student newspaper, and
at some point after that, Zaccari learned of Barnes's Facebook collage. Over the next
two weeks, Zaccari convened no less than five meetings about Barnes. At these

---

[3] Specifically, the article answered a letter to its author, Cary Tennis. The letter writer states
that she is mentally ill and felt stigmatized by the recent shootings at Virginia Tech. Tennis responds
that the universe is cruel but there is little we can do about it. She encouraged the letter writer to live
in the world as it is, to do the things she needs to do to get by, and not worry about what other people
think because that is beyond her control. (Dkt. 177–30.)

The article also contained a prominent advertisement for webshots.com. The ad encouraged
viewers to "Shoot it. Upload it. Get Famous." (Dkt. 177-30 at 4.) In other words, the ad asks people
to upload their own videos onto the internet and potentially become famous. (Dkt. 244 at 10 n.11.)

meetings, Zaccari characterized Barnes's behavior as threatening.[4]  No one on his staff agreed with his assessment.  Two mental health professionals, McMillan and the Director of the VSU counseling center, Dr. Victor Morgan, repeatedly told Zaccari that Barnes was not a threat to himself or others.[5]  Other university officials agreed among themselves that Zaccari was overreacting.

During this time, Zaccari told a VSU police officer, Ann Farmer, that someone had tripped the alarm system at his house the weekend of April 13 and that he had received prank calls asking for "the business officer."  Zaccari believed Barnes was responsible.  Farmer suggested that Zaccari file a formal police report and get a restraining order against Barnes.  He declined.  After their conversation, Farmer investigated Barnes and determined he was not a threat.  Barnes denies tripping the alarm and making the prank calls.

Zaccari explored several other avenues to remove Barnes from campus.  These included a mental health withdrawal and a disorderly conduct charge.  VSU's mental health withdrawal policy requires a mental health professional to recommend that the

---

[4] In particular, Zaccari appeared concerned that the word "memorial" in Barnes's collage referred to his death.

[5] Additionally, after her first meeting with the president, McMillan contacted Barnes's psychiatrist, Dr. Kevin Winders, about Zaccari's concerns.  Dr. Winders said that Barnes was not a threat and agreed to reassess Barnes.  He conducted this evaluation and concluded Barnes was not a threat.  He informed McMillan of his conclusions, but the record does not show that Zaccari learned about Dr. Winders's evaluation prior to Barnes's withdrawal.

student be withdrawn because he or she represents a danger to himself or others. This policy guarantees the student an informal hearing before the withdrawal and the opportunity to present pertinent evidence on his behalf. Zaccari's staff consistently said this policy did not apply to Barnes because he was not a threat. Zaccari also looked into bringing a disorderly conduct charge against Barnes under the VSU Student Code of Conduct. But this charge also requires a hearing where the student can present evidence on his behalf. Zaccari ultimately rejected these options as too "cumbersome." (Dkt. 190-1 at 95.)

Instead, Zaccari decided that he could "administratively withdraw" Barnes under Policy 1902. This policy, which is contained in the Board's Policy Manual and applicable to all institutions in the University System of Georgia, provides:

> Any student, faculty member, administrator, or employee, acting individually or in concert with others, who clearly obstructs or disrupts, or attempts to obstruct or disrupt any teaching, research, administrative, disciplinary, or public service activity, or any other activity authorized to be discharged or held on any campus of the University System is considered by the Board to have committed an act of gross irresponsibility and shall be subject to disciplinary procedures, possibly resulting in dismissal or termination of employment.

(Dkt. 179-7 at 49.) Zaccari announced his decision to "administratively withdraw" Barnes at a May 3 meeting with staff and others. He did not ask those present if he

was making the right decision, and no one told him he was.  Collectively though, the group agreed that Barnes should be withdrawn on May 7, a full four days later.

Zaccari also concluded that Policy 1902 did not require that he provide Barnes with prior notice of his decision or a hearing to oppose it.  But his in-house lawyer Laverne Gaskins warned Zaccari, on at least three occasions, that the "administrative withdrawal" would violate Barnes's due process rights.  Zaccari ignored these concerns and told Gaskins to draft a letter informing Barnes of his decision.

On May 7, the VSU police department slipped Zaccari's letter under Barnes's dorm room door.  It said:

> As a result of recent activities directed towards me by you, included but not limited to the attached threatening document [Barnes's Facebook collage], you are considered to present a clear and present danger to this campus.  Therefore, pursuant to Board of Regents' policy 1902, you are hereby notified that you have been administratively withdrawn from [VSU] effective May 7, 2007.

(Dkt. 190-2 at 47.)  The letter conditioned Barnes's readmission on submitting two letters from mental health professionals stating he was not a danger to himself or others and that he would be receiving therapy while enrolled at VSU.  The letter also informed Barnes he could appeal his withdrawal directly to the Board.  Within twenty-four hours, Barnes submitted the requested letters to Zaccari, who decided they did not meet the standard for readmission.  The parties dispute whether the

letters actually met this standard.  Barnes then appealed Zaccari's decision to the Board, which referred the matter to an administrative law judge.  By December 2007, Barnes had still not received a hearing.  In January 2008, after Barnes filed this lawsuit, the Board reinstated him without a hearing.

## II.  PROCEDURAL HISTORY

There are two claims before us on this interlocutory appeal.  Count Four of Barnes's complaint alleges a 42 U.S.C. § 1983 claim against Zaccari individually. The claim asserts that Zaccari violated Barnes's procedural due process rights under the Fourteenth Amendment by failure to give him, prior to his removal from campus, due notice of the charges against him and a hearing to meet those charges.  This Count seeks declaratory and injunctive relief and compensatory damages.

Count Five alleges a state-law breach of contract claim against the Board.  The claim asserts that the Board's policies and provisions in the VSU student handbook, as well as contracts for student housing, establish binding agreements between the Board and VSU students.  And, that the Board breached these agreements by failing to afford Barnes the procedural rights due him.  This count seeks only compensatory damages.

Zaccari and the Board moved to dismiss these claims.  Zaccari asserted qualified immunity and the Board asserted Eleventh Amendment immunity.  The

district court denied these motions.  Following discovery, Zaccari and the Board moved for summary judgment, Zaccari asserting qualified immunity and the Board asserting Eleventh Amendment immunity.  The district court also denied these motions.  Zaccari and the Board timely appealed.[6]

## III.  ISSUES ON APPEAL

Zaccari contends the district court erred in denying him qualified immunity because: (1) he did not deprive Barnes of a constitutionally protected property interest; (2) even if he deprived Barnes of a constitutionally protected property interest, Barnes received all the process he was due; and (3) even if Barnes did not receive all the process he was due, the law was not clearly established at the time.  The Board contends the district court erred in failing to dismiss Barnes's breach of contract claim as barred by the Eleventh Amendment.

## IV.  STANDARD OF REVIEW

"Because qualified immunity provides the right not to be burdened by trial, and not simply a defense to liability, this Court has jurisdiction to review interlocutory appeals from orders denying summary judgment based on qualified immunity." *Hartley v. Parnell*, 193 F.3d 1263, 1268 (11th Cir. 1999) (quoting *Tinney v. Shores*,

---

[6] The district court has not entered final judgment in this case.  We only have jurisdiction, on this interlocutory appeal, over the district court's denial of qualified immunity for Zaccari and denial of Eleventh Amendment immunity for the Board.

12

77 F.3d 378, 380 (11th Cir. 1996) (internal quotation marks omitted)). Similarly, we have jurisdiction under the collateral order doctrine to review the district court's order denying the Board summary judgment based on Eleventh Amendment immunity. *Summit Med. Assocs., P.C. v. Pryor*, 180 F.3d 1326, 1334 (11th Cir. 1999) (citations omitted). We review these questions of law de novo. *Hartley*, 193 F.3d at 1268; *Summit Med. Assocs.*, 180 F.3d at 1334.

## V. DISCUSSION

### A. THE DISTRICT COURT PROPERLY DENIED ZACCARI'S MOTION FOR SUMMARY JUDGMENT BASED ON QUALIFIED IMMUNITY

"Qualified immunity offers complete protection for government officials sued in their individual capacities as long as their conduct violates no clearly established statutory or constitutional rights of which a reasonable person would have known." *Lee v. Ferraro*, 284 F.3d 1188, 1193–94 (11th Cir. 2002) (quoting *Thomas v. Roberts*, 261 F.3d 1160, 1170 (11th Cir.2001) (internal quotations omitted)). To claim qualified immunity, a defendant must first show he was performing a discretionary function. *Mercado v. City of Orlando*, 407 F.3d 1152, 1156 (11th Cir. 2005) (citation omitted). The burden then shifts to the plaintiff to show that: (1) the defendant violated a constitutional right; and (2) the right was clearly established at

13

the time of the violation. *Id*. at 1156. Here, it is undisputed that Zaccari was performing a discretionary function.

### 1.  Barnes Had a Constitutional Right to Process Before He was Removed from VSU.

To defeat qualified immunity on a motion for summary judgment, Barnes must show that, when the facts are viewed in the light most favorable to him, Zaccari violated a constitutional right.  The Fourteenth Amendment guarantees that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV.  "Our inquiry into whether there was a denial of due process involves a two-part analysis.  We must determine whether [Barnes] was deprived of a protected property interest, and if so, what process was due." *Woodruff v. U.S. Dep't of Labor*, 954 F.2d 634, 641 (11th Cir. 1992) (citations omitted).

"[P]roperty interests subject to procedural due process protection are not limited by a few rigid, technical forms.  Rather, property denotes a broad range of interests that are secured by existing rules or understandings." *Perry v. Sindermann*, 408 U.S. 593, 601, 92 S. Ct. 2694, 2699 (1972) (citation omitted) (internal quotation marks omitted).  An individual can have a protected property interest in a government benefit when he has "a legitimate claim of entitlement to it." *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577, 92 S. Ct. 2701, 2709 (1972).  The claim of

14

entitlement must come from an independent source. *Id*. ("Property interests . . . are not created by the Constitution . . . [but] by existing rules or understandings that stem from an independent source . . . ."); *Sindermann*, 408 U.S. at 602 n.7, 92 S. Ct. at 2700 n.7. The independent source can be a statute, *see Goss v. Lopez*, 419 U.S. 565, 572–73, 95 S. Ct. 729, 735 (1975); a regulation, *see Glenn v. Newman*, 614 F.2d 467, 471–72 (5th Cir. 1980), *overruled on other grounds*, *Monroe Cnty., Fla. v. U.S. Dep't of Labor*, 690 F.2d 1359 (11th Cir. 1982); an express or implied contract, *see Sindermann*, 408 U.S. at 601–02, 92 S. Ct. at 2699–2700; or a mutually explicit understanding. *Id*. at 602–03, 92 S. Ct. at 2700.

"The hallmark of property . . . is an individual entitlement grounded in state law, which cannot be removed except 'for cause.'" *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 430, 102 S. Ct. 1148, 1155 (1982); *see Barry v. Barchi*, 443 U.S. 55, 65, 99 S. Ct. 2642, 2649 (1979); *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 9, 98 S. Ct. 1554, 1560 (1978); *Glenn*, 614 F.2d at 471. The independent source need not use the phrase "for cause" so long as the parties understood their agreement would have that effect. *See Peterson v. Atlanta Hous. Auth.*, 998 F.2d 904, 914 (11th Cir. 1993).

Once a state creates a substantive interest in a government benefit, "federal constitutional law determines whether that interest rises to the level of a legitimate

claim of entitlement protected by the Due Process Clause." *Memphis Light, Gas & Water Div.*, 436 U.S. at 9, 98 S. Ct. at 1560 (citation omitted) (internal quotation marks omitted); *Brown v. Ga. Dep't of Revenue*, 881 F.2d 1018, 1027 (11th Cir. 1989).

Zaccari contends that Barnes had no legitimate claim of entitlement to remain enrolled at VSU. But Barnes's entitlement is established by both the Board's Policy Manual and the VSU Student Code of Conduct (the "Code"). Both these documents constitute official regulations of the State of Georgia. The Georgia Constitution specifically vests control of the University System of Georgia with the Board. Ga. Const. art. VIII, § 4, para. I. Under this authority, the Board promulgated a Policy Manual. The manual includes Policy 401.01, which provides:

> Admission, discipline, promotion, graduation and formulation of all rules and regulations pertaining to student institutions of the University System are matters to be handled by the institutions within the framework of regulations of the Board of Regents. Students violating rules and regulations of an institution may be punished, suspended, excluded, or expelled as may be determined by the institution.

(Dkt. 179-8 at 42.) This provision vests institutions (like VSU) with authority to make rules governing student discipline within "the framework of regulations of the Board of Regents." (*Id.*) The next sentence authorizes institutions to "punish[], suspend[], exclude[], or expel[]" those students who are "violating rules and

16

regulations of [the] institution." (*Id*.)  Policy 401.01 does not authorize institutions to punish all students—only a certain class of students, those violating the rules or regulations of the institution.  By implication, then, Policy 401.01 withholds authority to discipline students who follow the rules and regulations.

Under Policy 401.01, VSU promulgated the Code. The Code similarly limits VSU's authority to discipline students to those students who have committed a violation of the Code.  In the section titled "Disciplinary Sanctions," the Code lists sanctions, including suspension and expulsion, that "may be imposed upon a student . . . *for a finding of responsibility* for violations of the Student Code of Conduct."[7]  (Dkt. 179-1 at 10) (emphasis added).  This provision promises VSU students they will not face disciplinary sanctions until they are found responsible for violating the Code.

Thus, the Policy Manual and the Code permit VSU to impose disciplinary sanctions[8] only "for cause."  The cause at issue here is a violation of the Code.  Until

---

[7] The record is clear that Barnes was making satisfactory academic progress when  he was withdrawn from campus.

[8] Zaccari contends that Barnes's administrative withdrawal was not a disciplinary sanction. We disagree.  The structure and plain language of the Code compel this conclusion.  The Code is divided into several sections including Appendix A (detailing the rules students must comply with) and Appendix B (setting out enforcement procedures).  Appendix A is further subdivided into Academic and Non-Academic rules.  The Academic section describes the procedures followed in punishing a violation of that section.  However, the Non-Academic section does not set out any procedures for punishing violations of that section.  Instead, the procedures to punish violations of

a student violates it, that student has a legitimate claim of entitlement to continued enrollment at VSU under Georgia law.[9]  Under *Logan v. Zimmerman Brush Co.*, this claim of entitlement gives Barnes a property interest in his enrollment at VSU.

Having established Barnes's entitlement under Georgia law, we next ask whether his entitlement is sufficiently important to warrant protection under the Due Process Clause.  It clearly is.  *See Dixon v. Ala. State Bd. of Educ.*, 294 F.2d 150, 157 (5th Cir. 1961).  Indeed, no tenet of constitutional law is more clearly established than the rule that a property interest in continued enrollment in a state school is an important entitlement protected by the Due Process Clause of the Fourteenth

---

the Non-Academic Code of Conduct are set forth in Appendix B.

The authority Zaccari cited for Barnes's administrative withdrawal—Policy 1902—is located in the Non-Academic section.  This location indicates that Policy 1902 will be enforced in the same manner as all other disciplinary rules—the procedures set forth in Appendix B.  Additionally, Policy 1902 specifically states that students who violate it "shall be subject to disciplinary procedures." (Dkt. 179-7 at 49.)  Again, the only non-academic disciplinary procedures set out in the Code are located in Appendix B.  Finally, the section in Appendix B titled "Disciplinary Sanctions" provides the following definitions:

> A.  Expulsion: permanent severance of the student's/organization's relationship with the University.
> B.  Disciplinary Suspension: a temporary severance of the student's/organization's relationship with the University for a specific period of time.

(Dkt 179-7 at 10.)  We see no substantive distinction between the "administrative withdrawal" imposed by Zaccari and the Code's definitions of "expulsion" and "disciplinary suspension." Zaccari's creative labeling cannot avoid the plain language of the Code.

[9] We do not hold that all students at state colleges and universities are entitled to continued enrollment.  We hold only that one making satisfactory academic progress and obeying the rules of the school has a legitimate claim of entitlement to continued enrollment under the Board and VSU's policies.

18

Amendment. *See, e.g.*, *Goss v. Lopez*, 419 U.S. 565, 574, 576 n.8, 95 S. Ct. 729, 736, 737 n.8 (1975) (noting that since 1961, "the lower federal courts have uniformly held the Due Process Clause applicable to decisions made by tax-supported educational institutions to remove a student from the institution long enough for the removal to be classified as an expulsion."); *Dixon*, 294 F.2d at 157. Thus, we now turn to the second question: What process is due?

Fifty years ago in *Dixon v. Alabama State Board of Education*, the court said, "[D]ue process requires notice and some opportunity for hearing before a student at a tax-supported college is expelled for misconduct." 294 F.2d at 157.[10] Similarly, the Supreme Court held in *Goss v. Lopez* that, with a suspension of ten days, a student should receive notice and a hearing before the suspension. 419 U.S. at 581–82, 95 S. Ct. at 740 ("[D]ue process requires, in connection with a suspension of 10 days or less, that the student be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story. The Clause requires at least these rudimentary precautions against unfair or mistaken findings of misconduct and arbitrary exclusion from school.")

---

[10] *Dixon* is binding precedent in this circuit under *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981).

19

VSU is a state university, and Barnes was removed for misconduct—violating Policy 1902.  It is undisputed that Barnes was removed for longer than ten days, and that he received no predeprivation process.[11]  We need not decide the details of the process due Barnes.[12]  It is enough to say that *Dixon* and *Goss* establish that he was due notice of the charges and a hearing prior to his removal.[13]

Zaccari contends he faced an emergency which required immediate action.  In *Goss*, the Court recognized that school officials can and do face emergency situations.  *Goss*, 419 U.S. at 582–83, 95 S. Ct. at 740.  In an actual or reasonably perceived emergency, predeprivation process "cannot be insisted upon." *Id*. at 582.  Instead, the process due a student in an emergency would depend on a balancing of the different interests involved.  *See Mathews v. Eldridge*, 424 U.S. 319, 334–35, 96 S. Ct. 893, 902–03 (1976).  But we need not determine the process due in an emergency because, when we view the facts in the light most favorable to Barnes, no emergency existed.

---

[11] The district court found that Barnes first learned of the charges against him on May 7, 2007, when he received Zaccari's letter withdrawing him from campus.

[12] The *Goss* court did not dictate the form that the notice and hearing should take.  Instead, it recognized that the notice could be informal and that the hearing could occur only minutes after the student's misconduct.  *Goss*, 419 U.S. at 582, 95 S. Ct. at 740.  Following *Goss*, students have frequently challenged the adequacy of the notice and hearing.  *See Nash v. Auburn Univ.*, 812 F.2d 655 (11th Cir. 1987).  As this court noted in *Nash*, the adequacy of the notice and hearing will depend upon the competing interests involved. *Id.* at 660 (citation omitted).

[13] Because we conclude, for purposes of this appeal, that Barnes was due some predeprivation process, we reject Zaccari's arguments about available postdeprivation remedies.

20

Zaccari says that Barnes engaged in threatening behavior.  But Barnes's Facebook collage, emails, and letter—when viewed in the light most favorable to him—reveal a student who is passionate about environmental issues, but do not require an inference that Barnes intended to harm someone.  Zaccari claims that his name connected to the word "memorial" in Barnes's Facebook collage suggests that Zaccari would soon be dead.  But reasonable minds could differ.  Several university officials contemporaneously viewed the collage and concluded it was not threatening.  And the Director of the VSU Counseling Center, Dr. Victor Morgan, told Zaccari that the collage was not a threat.

Zaccari claims he received prank calls at his home and that someone tripped the alarm system at his house.  But Barnes denies making these calls and denies that he tripped Zaccari's alarm.  Zaccari points out that he employed a security detail to guard him at university functions and emphasizes that others perceived him as visibly shaken.  Other evidence suggests that Zaccari was not actually afraid of Barnes.  For example, Police Major Ann Farmer suggested that Zaccari get a restraining order against Barnes, but he declined.  And after deciding to "administratively withdraw" Barnes, Zaccari waited four days to execute his decision.

Other evidence suggests that any fear was unreasonable.  Farmer investigated Barnes, but took no action against him.  Barnes's university counselor, McMillan; his

21

psychiatrist, Dr. Winders; and Dr. Morgan all believed that Barnes posed no danger to himself or others.  Other university officials also concluded that Barnes was not a threat and that Zaccari was over reacting.

Zaccari emphasizes that Barnes's conduct came shortly after the shootings at Virginia Tech.  Other university officials experienced the same shock and concern generated by the tragedy at Virginia Tech, but concluded that Barnes was not a threat.

We hold that a jury could conclude that an objectively reasonable person in Zaccari's position would not have found Barnes presented a threat to safety of VSU's campus sufficient to warrant an "emergency" suspension or expulsion.  We turn now to the second part of the qualified immunity analysis:  Was Barnes's right to this predeprivation process clearly established at the relevant time?

### 2.  Barnes's Constitutional Right Was Clearly Established in May 2007

"The relevant, dispositive inquiry in determining whether a right is *clearly* established is whether it would be *clear* to a reasonable [university president] that his conduct was unlawful in the situation he confronted." *Vinyard v. Wilson*, 311 F.3d 1340, 1350 (11th Cir. 2002) (quoting *Saucier v. Katz*, 533 U.S. 194, 202, 121 S. Ct. 2151, 2156 (2001)).  To answer this question, we look to law as decided by the Supreme Court, the Eleventh Circuit, or the Supreme Court of Georgia.  *See Willingham v. Loughnan*, 321 F.3d 1299, 1304 (11th Cir. 2003).

22

Zaccari contends that Barnes's property interest in his continued enrollment was not clearly established when he was "administratively withdrawn" in May 2007. But, at that time, Board Policy 401.01 and the Code clearly established that Zaccari could not suspend or expel Barnes without cause—i.e., Barnes violating a provision in the Code.  And the Supreme Court's decisions in *Board of Regents of State Colleges v. Roth*, 408 U.S. at 577, 92 S. Ct. at 2709; *Perry v. Sindermann*, 408 U.S. at 601, 92 S. Ct. at 2699; and *Logan v. Zimmerman Brush Co.*, 455 U.S. at 430, 102 S. Ct. at 1155, clearly established that when a government benefit "cannot be removed except 'for cause,'" an individual has a property interest in that benefit protected under the Due Process Clause.  *Zimmerman Brush Co.*, 455 U.S. at 430, 102 S. Ct. at 1155. Similarly, in *Winkler v. DeKalb County*, we said:

> [A]lthough the primary source of property rights is state law, the state may not magically declare an interest to be "non property" after the fact for Fourteenth Amendment purposes if, for example, a longstanding pattern of practice has established an individual's entitlement to a particular governmental benefit.

648 F.2d 411, 414 (11th Cir. 1981) (quoting *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 448 (2d Cir. 1980)).  The Code repeatedly assures VSU students that they will receive due process before being suspended or expelled.[14] Having made

---

[14]  For example, in the section titled "Disciplinary Process," the Code provides that "disciplinary sanctions shall be applied only after the requirements of due process . . . have been met."  (Dkt. 179-7 at 8.)  The section on "Disciplinary Sanctions" lists sanctions which "may be

23

such assurances, Zaccari cannot reverse course and "magically declare" Barnes's entitlement to his continued enrollment is not a protected property interest under the Due Process Clause. 648 F.2d at 414.

The process due Barnes was also clearly established. In *Dixon*, the court held: "[D]ue process requires notice and some opportunity for hearing before a student at a tax-supported college is expelled for misconduct." 294 F.2d at 158. Barnes was a student at VSU, a state university, and he was expelled for misconduct—violating Policy 1902. He received no notice or hearing before he was expelled.

The Supreme Court's decision in *Goss* further reinforces our conclusion. 419 U.S. at 581, 95 S. Ct. at 740. In that case, the Court held that a student facing a ten day suspension is entitled to some kind of process—albeit informal and summary—before the suspension is imposed. Thus, even if Zaccari could show that Barnes's "administrative withdrawal" was a suspension rather than an expulsion, Barnes's right to predeprivation process would be no less clear.[15]

---

imposed . . . *for a finding of responsibility* for violations of the [Code]." (*Id.* at 10.) (emphasis added). The only body able to make a "finding of responsibility" under the Code is a student judicial committee. At judicial committee hearings, students are guaranteed "all rights required by due process." (*Id.* at 7.)

[15] As we noted earlier, Zaccari contends that he faced an emergency situation which required immediate action. But a jury could conclude that Zaccari did not face an emergency. Therefore, we express no opinion on whether the process due in an emergency was clearly established.

Therefore, the decisions of this court and the Supreme Court clearly established in May 2007 that (1) Barnes had a protected property interest and that (2) he was due some predeprivation process before VSU could deprive him of that interest. Because Barnes received no predeprivation process, we affirm the district court's denial of Zaccari's motion for summary judgment grounded on qualified immunity.

However, Zaccari's qualified immunity defense does not drop out of the case. *See Cottrell v. Caldwell*, 85 F.3d 1480, 1487 (11th Cir. 1996). At trial, the district court can use a special verdict or written interrogatories to determine any disputed facts and the reasonable inferences drawn from those facts. *Id.* Once these issues are decided, Zaccari may reassert his qualified immunity defense in a motion for judgment as a matter of law. *Id.*

### B. THE DISTRICT COURT ERRED IN FAILING TO DISMISS BARNES'S BREACH OF CONTRACT CLAIM AGAINST THE BOARD AS BARRED BY THE ELEVENTH AMENDMENT.

The Eleventh Amendment provides:

> The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State or by Citizens or Subjects of any Foreign State.

U.S. CONST. amend XI. The parties agree the Board is an "arm of the state" usually entitled to Eleventh Amendment immunity. (Dkt. 1 at 29); *see Robinson v. Ga. Dep't*

25

*of Transp.*, 966 F.2d 637, 638 (11th Cir. 1992).  But Barnes contends, and the district

court ruled, that Georgia has waived its Eleventh Amendment immunity from suit in

federal court for breach of contract claims.  We disagree.

The test to determine if a state has waived its sovereign immunity "is a

stringent one."  *Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*,

527 U.S. 666, 675, 119 S. Ct. 2219, 2226 (1999) (quoting *Atascadero State Hosp. v.

Scanlon*, 473 U.S. 234, 241, 105 S. Ct. 3142, 3146 (1985)); *Edelman v. Jordan*, 415

U.S. 651, 673, 94 S. Ct. 1347, 1361 (1974).  A waiver of Eleventh Amendment

immunity must specifically permit suits in federal court.  *Port Auth. Trans-Hudson

Corp. v. Feeney*,  495 U.S. 299, 306, 110 S. Ct.  1868, 1873 (1990) ("[I]n order for

a state statute or constitutional provision to constitute a waiver of Eleventh

Amendment immunity, it must specify the State's intention to subject itself to suit in

federal court.") (quoting *Atascadero State Hosp.*, 473 U.S. at 241, 105 S. Ct. at

3146–47); *Robinson*, 966 F.2d at 640.  Moreover, the Supreme Court has said that "a

State does not consent to suit in federal court merely by consenting to suit in the

courts of its own creation."  *Coll. Sav. Bank*, 527 U.S. at 676, 119 S. Ct. at 2226

(citing *Smith v. Reeves*, 178 U.S. 436, 441–45, 20 S. Ct. 919, 921–23 (1900)).

The Georgia constitution waives the state's sovereign immunity for actions *ex

contractu*.  Ga. Const. art. 1, § 2, para. IX(c).  Similarly, the Georgia Code also

waives the state's sovereign immunity for breach of contract claims. Ga. Code Ann. § 50-21-1(a). But neither provision expressly consents to suits in federal court. Absent this express consent, Georgia has not waived its Eleventh Amendment immunity from suit in federal court for breach of contract claims.

In fact, Georgia expressly retained its Eleventh Amendment immunity from such claims. Following the waiver of sovereign immunity in the Georgia constitution, a separate subsection provides that: "No waiver of sovereign immunity under this Paragraph shall be construed as a waiver of any immunity provided to the state or its departments, agencies, officers, or employees by the United States Constitution." Ga. Const. art. 1, § 2, para. IX(f). Eleventh Amendment immunity is an immunity provided by the United States Constitution. Additionally, the waiver in the Georgia Code states that "venue with respect to any [breach of contract] action shall be proper in the Superior Court of Fulton County, Georgia." Ga. Code Ann. § 50-21-1(b). Under *Smith v. Reeves*, 178 U.S. 436, 441–45, 20 S. Ct. 919, 921–23 (1900), a state can consent to suit in its own courts without consenting to suit in federal court. And that is exactly what Georgia did when it enacted § 50-21-1.

In this case, the district court reasoned that the Board waived its Eleventh Amendment immunity because it failed to contest venue in its Fed. R. Civ. P. 12(b) motion to dismiss. This was error. "Generally, we will find a waiver either if the

27

State voluntarily invokes our jurisdiction, or else if the State makes a 'clear declaration' that it intends to submit itself to our jurisdiction." *Fla. Prepaid*, 527 U.S. at 675–76, 119 S. Ct. at 2226 (1999) (citation omitted). Here, the Board did not invoke federal court jurisdiction. And the Board raised the Eleventh Amendment as a defense at the outset of this case in its Rule 12(b) motion.

Because Georgia has not waived its Eleventh Amendment immunity, we hold that the district court lacked jurisdiction to decide Barnes's breach of contract claim against the Board. *See Maynard v. Bd. of Regents of Div. of Univs. of Fla. Dep't of Educ. ex rel. Univ. of S. Fla.*, 342 F.3d 1281, 1287 (11th Cir. 2003). The district court erred in granting Barnes's motion for summary judgment.

VI. CONCLUSION

Because Barnes had a clearly established constitutional right to notice and a hearing before being removed from VSU, we affirm the district court's denial of Zaccari's motion for summary judgment based on qualified immunity, and remand for further proceedings consistent with this opinion.

Because Georgia has not waived its Eleventh Amendment immunity for breach of contract actions, we reverse the district court's denial of the Board's motion for summary judgment on Barnes's breach of contract claim, and remand with instructions to dismiss the claim against the Board for want of jurisdiction.

28

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED WITH INSTRUCTIONS.